**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

LORNE CARTER,

              Plaintiff,

v.

                                    Case No. 20-10442

MICHAEL KLENNER, et al.,

              Defendants.

_____/

**OPINION AND ORDER GRANTING SUMMARY JUDGMENT
TO ALL DEFENDANTS**

Plaintiff Lorne Carter fled a traffic stop and led Michigan State Police on a high-speed chase that ended when Officers used their patrol cars to spin out Plaintiff's sedan and pin it against a residential garage door. Plaintiff was tased, punched, and forcibly removed from his vehicle through the driver's-side window before Officers handcuffed him on the ground and placed him under arrest. Plaintiff has asserted both 42 U.S.C. § 1983 excessive force and failure to intervene claims against all seven Defendant Officers. Plaintiff's arrest and preceding events are well documented through dashcam footage. Defendants have filed a joint motion for summary judgment that collectively seeks summary judgment on all pending claims in this action. (ECF No. 29.) The motion has been fully briefed and the court finds a hearing unnecessary. E.D. Mich. L.R. 7.1(f)(2). For the reasons explained below, the court concludes that summary judgment should be granted in favor of Defendants on all claims.

## I. BACKGROUND

After dark, on March 4, 2017, Defendant State Trooper Michael Klenner was performing traffic enforcement on the eastbound side of the Davidson Freeway in Detroit. (ECF No. 29-12, PageID.652.) While sitting on the shoulder, he observed a gray 2009 Ford Focus sedan speeding (traveling 82 mph in a posted 55 mph zone). (*Id.*) Officer Klenner caught up to the Ford, which was being driven by Plaintiff Lorne Carter, as he waited at a traffic light to make a left turn onto Ryan Road. (*Id.*) But when Officer Klenner activated his lights, Plaintiff did not pull over. (*Id.*) Instead, Plaintiff led Officer Klenner, and eventually other Michigan State Troopers, on a seven-minute high-speed chase through various residential and arterial streets on the east side of Detroit, with Plaintiff at times "traveling in excess of 70 mph in a posted 25 mph zone." (*Id.*) Klenner's initial traffic stop, the chase, and Plaintiff's subsequent arrest are all captured on dashcam footage from each of the various police cars involved. (*See, e.g.*, Defendants' Exhibit A, Klenner In-Car Video 1, ECF No. 29-2, PageID.186.)[1]

At the start of the chase, Officer Klenner radioed for assistance and pursued Plaintiff for about two minutes before Plaintiff drove to the dead end of a residential street. (Def. Ex A. at 0:25-2:10.) As Plaintiff attempted to turn around in a vacant lot at the end of the road, Officer Klenner positioned the front end of his Dodge Charger patrol car head-to-head with Plaintiff's vehicle to box in Plaintiff using a high chain-link fence which surrounded the lot on two sides. (*Id.* at 2:10-2:25) Within seconds, Officer Klenner

---

[1]      Plaintiff does not dispute the authenticity of the video. For the sake of consistency, the court will use the runtime of each video for citations purposes because timestamps displayed on the various cameras were not necessarily synchronized. (*See* ECF No. 29, PageID.153.)

was joined in his efforts by another MSP patrol car driven by Defendant Officer Nolan

Przybylo. (*Id.*)

**Image 1, Screenshot from Def. Ex. A, Klenner Dashcam**



As Plaintiff's deposition testimony indicates, Officer Klenner exited the door of his

patrol car and stood behind the doorframe with his weapon drawn, shouting and

gesturing at Plaintiff to roll down his window. (ECF No. 29-3, PageID.225-26.) After

pausing for only a few seconds, however, Plaintiff can be seen on the video rapidly

accelerating toward the small gap between the driver's side of Officer Klenner's patrol

car and the chain link fence as Klenner commands Plaintiff to "stop." (Def. Ex A. at 2:20-

2:30.) Outside of the camera frame, Klenner testified that he was forced to jump back

into his patrol car to narrowly avoid being hit as Plaintiff's vehicle scraped down the side

of Klenner's Dodge. (ECF No. 29-5, PageID.330.) Klenner further testified that, given

the speed of the incident and the close distance, he believed that Plaintiff had intended

to hit him. (*Id.*, PageID.334.) Plaintiff disputed this point in his testimony, stating that his

3

intent was only to flee, but indisputably the video shows that his car made contact with both the fence and the side of Plaintiff's patrol car as he accelerated past. (Def.'s Exhibit L, Klenner Dashcam, Video 2 at 2:15-2:25; *see also* ECF No. 29-3, PageID.231-32 ("I actually ran my car into a fence, and my car bounced off the fence, and that's how literally it came in [contact with the] side of their [police] car.").)

With Przybylo now in the lead, the chase continued for approximately five minutes. As the chase unfolded, Klenner can be heard on an open radio channel advising that the suspect had rammed his car: "yeah, he tried to run me over Sarge when I got out of the car." (*Id.* at 3:45-3:50.) Attempting to end the pursuit, Przybylo twice tried unsuccessfully to spin out Plaintiff's car using a "PIT (precision immobilization technique) maneuver," but each time Plaintiff recovered and continued driving. (*See* Defendants' Exhibit C, Przybylo In-Car Video, ECF No. 29-4, PageID.294 at 4:20-9:10.) Finally, Przybylo's third PIT maneuver successfully pinned the driver's side of Plaintiff's car against a residential garage door.

**Image 2, Screenshot from Def. Ex. C, Przybylo Dashcam**



By the time of Officer Przybylo's successful PIT maneuver, additional MSP units had joined the chase, and Officers positioned three of these cars to block in Plaintiff's vehicle on three sides. Despite the blockade, dashcam footage shows that the Ford Focus's front tires continued turning back and forth, and his car lurched backward with significant force as the first Officers approached Plaintiff's car on foot. (Defendants' Exhibit J, Boczkaja In-Car Video, ECF No. 29-11, PageID.650 at 6:05-6:18.)

Defendant Officer Justin Boczkaja[2] was the first to reach the driver's door of Plaintiff's vehicle, but he soon discovered that the car was still locked. Dashcam footage indicates that Plaintiff initially put his hands up for about three seconds as Boczkaja approached while shouting commands. (Defendants' Exhibit I, Tolbert In-Car Video, ECF No. 29-10, PageID.649 at 9:10-9:15.) But Plaintiff quickly put his hands down, and, perceiving Plaintiff to be "reaching around," Officer Boczkaja deployed pepper spray through the driver's window which was rolled down "about an inch." (*Id.* at 9:15-9:19; ECF No. 29-7, PageID.485.) Officer Boczkaja testified that he deployed the spray to disorient Plaintiff and get him to "stop [driving] at that point." (*Id.*, PageID.488.) Because the doors to Plaintiff's car remained locked, Defendant Officer David Bellestri attempted to break the driver's side window with his baton to gain access as Officers repeatedly shouted at Plaintiff to "get out of the car." (Def. Ex. I at 9:19-9:24; *Id.*, PageID.486.) At no point, however, did Plaintiff attempt to exit his car. [3]

---

[2]     While the case caption lists "David Boczkaja" as a Defendant, the Defendants' brief advises that his actual name is "Justin Boczkaja." (*See* ECF No. 29, PageID.155.)
[3]     Based on the damage to the car and its positioning close to the garage, Plaintiff's testimony indicates that it was likely impossible for him to exit his car normally through the driver's door. (*See* ECF No. 29-3, PageID.251 ("I mean, I knew that they hit my door so I knew that wasn't an option. It was caved in.").

Almost simultaneously, Officer Przybylo was able to break the front passenger side glass, where he immediately reached around the side-curtain airbag to deploy his taser, which he activated for about five seconds. (*Id.* 9:24-9:31; ECF No. 29-14, PageID.669.) Przybylo testified that he perceived that Plaintiff was still trying to drive because he had a hand on the steering wheel, and he thought the car was still in gear. (ECF No. 29-9, PageID.606.) However, according to Przybylo, one of the taser's probes lodged in an armrest, so it proved ineffective. (*Id.*, PageID.606.) Przybylo's testimony appears to be at least partially corroborated by dashcam footage which does not show Plaintiff visibly reacting to the taser. (Def. Ex. I at 9:25-9:45.)

As Przybylo deployed his taser through the passenger window, the group of Officers, standing in the small gap between the Focus's driver-side door and the garage, were finally able to break the driver's window and begin physically pulling Plaintiff from the car. (*Id.*) The dashcam shows Officers struggling to pull Plaintiff out of the car through the driver's window as Plaintiff held onto something in the interior for about twenty seconds. (*Id.*; ECF No. 29-5, PageID.367.) Plaintiff, who had a valid CPL license and a pistol concealed in a holster on his hip at the time of the incident, testified that he was afraid of being shot if he moved his hands, so "I kept my hands on the wheel." (ECF No. 29-3, PageID.249.) As the Officers attempted to pull Plaintiff from the car, Officer Klenner can be seen striking Plaintiff in the upper body three times. (Def. Ex. I at 9:25-9:29.) The blows do not appear to have been particularly forceful.

When Officers had partially pulled Plaintiff through the driver's window, Defendant Sergeant Michael Zarate, who had joined the fray, noticed Plaintiff's concealed weapon on his hip and began shouting, "Gun! Gun!" (*Id.* at 9:29-9:36; ECF

No. 33-4, PageID.928-29.) As Zarate attempted to remove the gun from Plaintiff's hip,
Klenner delivered another blow to Plaintiff's head or upper body. (*Id.*) Officer Przybylo
also delivered at least one visible punch to Plaintiff's head. (Def. Ex. C at 9:35-40.)
There is no allegation that Plaintiff ever reached for the gun. Five Officers working
together were then able to finally pull Plaintiff entirely out of the car, remove his loaded
pistol, and carry Plaintiff in a prone position to an area behind the rear of his vehicle
where there was room to put Plaintiff on the ground face down. (Def. Ex. A at 7:50-
8:05.) As Officers carried Plaintiff, the video shows that Plaintiff continued to contract his
torso, squirm, and move his feet in an apparent attempt at resisting Officers. (*Id.*)

Plaintiff testified that Officers, including Defendant Officer Brennan Kelly,
dropped him on the ground, allowing his face to smash into the ground and causing a
cut above his eye. (ECF No. 33-2.) Once Plaintiff was face down on the ground, the
Officers continued to struggle with him for approximately fifteen seconds. During this
time, Officers repeatedly commanded Plaintiff to "give me your hands." (Def. Ex. I at
7:58-8:14.) An Officer was eventually able to grab one of them. (*Id.*) Within the next
forty-five seconds, Plaintiff was fully handcuffed and returned to his feet. (*Id.* at 8:15-
9:00.) Once Plaintiff was on his feet, he began to converse with the Officers. (*Id.* at
9:00-10:00.)

When EMS arrived on the scene, Plaintiff refused treatment. (ECF No. 29-3,
PageID.263.) Nevertheless, he was taken to Detroit Receiving Hospital where he was
diagnosed with a bruised rib and given stitches for a laceration over his left eye. (*Id.* at
PageID.267.) As a result of Plaintiff's conduct that evening, he was initially charged with
six felonies; however, as part of a plea deal, he later pled guilty to a felony of fleeing

7

and eluding-third degree. (ECF No. 29, PageID.150.) Plaintiff served about one year in the Wayne County Jail as a result of the conviction. (*See* ECF No. 33-2, PageID.834.)

As a result of the encounter, Plaintiff alleged in his complaint that he suffered several injuries. (*See* ECF No. 1, PageID.9.) Plaintiff is not asserting a *Monell* claim, and the court previously declined to exercise supplemental jurisdiction over two additional state law claims for gross negligence and assault and battery. (*See* ECF No. 12.) Plaintiff pursued these two state law claims in Wayne County Circuit Court, but the Circuit Court subsequently granted summary disposition in favor of Defendant Officers on all of Plaintiff's state claims. (*See* ECF No. 37, PageID.1042.) In the instant case, Plaintiff's complaint lists two claims against all Defendants presently at issue for purposes of summary judgment:

Count I: 42 U.S.C. § 1983 claim against all Defendant Officers for excessive force;

Count II: 42 U.S.C. § 1983 claim against all Defendant Officers for failure to intervene;

(*See* ECF No. 1.)

Discovery in the case is now complete. Defendants have now filed a motion seeking summary judgment on all pending claims.

## II. STANDARD

To prevail on a motion for summary judgment, a movant must show—point out— that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presentation that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no

requirement, however, that the moving party "support its motion with [evidence] negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). For a court to deny summary judgment, "the evidence [must be] such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

In the present case, both parties agree that the relevant events were largely captured on dashcam footage and relevant bystander video. While the court draws all reasonable inferences in favor of Plaintiff as the non-moving party, the court need "not accept Plaintiff's facts to the extent that they are 'blatantly contradicted by the record.'" *Mitchell v. Schlabach*, 864 F.3d 416, 418 (6th Cir. 2017) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (citation omitted).

## III. DISCUSSION

Defendants move for summary judgment on qualified immunity grounds. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In analyzing a party's entitlement to qualified immunity, the Supreme Court has noted: "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Several years later, the Supreme Court further honed its qualified immunity analysis, providing that "judges . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "Each Defendant's liability must be assessed individually based on his or her own actions." *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015).

### A. Excessive Force

A claim for excessive use of force is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Reasonableness "requires careful attention to the facts and circumstances of each particular case." *Id.* at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." *Id.* There is a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002).

The reasonableness standard focuses on the specific moment in time the officer made his decision to use force and the information he had at that time. *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007). It does not consider "whether it was reasonable for the officer 'to create the circumstances'" and "it does not require them to perceive a situation accurately." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 915-16 (6th Cir. 2009)). "When, 'as here, a plaintiff claims that excessive force was used multiple times, the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way.'" *Hammond v. Cty. of Oakland, Michigan*, 825 F. App'x 344, 346 (6th Cir. 2020) (quoting *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020)).

The Supreme Court in *Graham* "set[] out a three-factor test to aid courts in assessing objective reasonableness." *Graves v. Malone*, 810 F. App'x 414, 421 (6th Cir. 2020). "Those factors are: (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396-97).

### 1. Plaintiff's removal from car

The initial segment relevant to the court's excessive force analysis is the short period of time between when Defendant Officers first approached Plaintiff's pinned-in

11

vehicle and when he was removed from the car. After weighing undisputed evidence relevant to the *Graham* factors, the court concludes that the Defendant Officers' use of force to physically pull Plaintiff from his vehicle was objectively reasonable. Further, the court finds that Defendant Officers' use of pepper spray, a taser, and limited punches to effectuate Plaintiff's removal was not objectively unreasonable and thus did not violate the Fourth Amendment.

The court finds that the seriousness of the crimes committed by Plaintiff that evening weighs strongly in favor of a significant use of force by Defendants when they finally cornered Plaintiff's vehicle. The undisputed dash cam footage shows that Plaintiff led Officers on a seven-minute, high-speed chase through both residential and arterial streets, during which Plaintiff disobeyed various stop signs and traffic lights. "In doing so, [Plaintiff] knowingly placed himself, [Defendants], and the public at risk of severe injury or death." *Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017). And the Sixth Circuit has previously noted a high-speed chase that leads to a felony fleeing and eluding conviction is a serious enough crime "to weigh in favor of a finding of reasonableness" regarding the use of significant force. *See id.*

Next, the court holds that the immediate threat posed to the safety of arresting officers also supports the Officers' use of force. As Defendants noted in their summary judgment brief, the seriousness of Plaintiff's conduct that evening, and the apparent risk to Officers who approached his boxed-in vehicle, was substantially elevated by Plaintiff's decision to escape after being cornered. This escape involved Plaintiff's acceleration toward a small gap where Officer Klenner was standing. Plaintiff states he never intended to hit the Officer or his patrol car, but such subjective intent is irrelevant

here because, after viewing the dashcam footage, the court finds that any reasonable policeman in Klenner's position would have, at minimum, concluded that Plaintiff was willing to strike an officer with his vehicle to escape capture. *See Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 609 (6th Cir. 2020) (citing *Graham*, 490 U.S. at 396) (pointing out that the perspective of a reasonable officer on the scene is limited to information that is known at the time). The video clearly shows that Plaintiff even attempted to jockey his car free seconds before officers approached the vehicle. (Def. Ex J at 6:05-6:18.)

The responding Troopers had either witnessed Plaintiff's conduct directly or heard Klenner's radio transmission indicating that Plaintiff had "tried to run me over [] when I got out of the car." (*See* Def. Ex A. at 3:45-3:50.) Video indisputably shows that as Officers first approached Plaintiff's vehicle, he was still hitting the accelerator and turning the steering wheel. (Def. Ex. J at 6:05-6:18.) And Defendant Officers Przybylo and Bellestri expressly testified in their depositions that, when approaching Plaintiff's Ford, they perceived Plaintiff might again attempt to plow his way out of the blockade, even if it meant hitting one of the Officers approaching his car. (ECF No. 29-6, PageID.441 (noting that the scene seemed especially dangerous because "Trooper Klenner called out over the air that [Plaintiff] attempted to run him over with . . . the [vehicle]"); ECF No. 29-9, PageID.608 (remarking that Plaintiff is "still capable of injuring one of my peers by jockeying that car back and forth"). Further, when approaching a suspect acting so aggressively and erratically, the court notes that a reasonable Officer would also perceive the situation as dangerous because an Officer must assume that such a suspect may be armed. So, in sum, the court finds the fact that Plaintiff's vehicle

was now cornered does not mean that the threat to the approaching Officers' safety was substantially lowered.

Plaintiff's responsive briefing does not strenuously contest the first two *Graham* factors; rather, Plaintiff argues that the third *Graham* factor weighs against Defendants' use of force because he had given up and surrendered by the time he was pulled from the car, offering only passive resistance. The crux of Plaintiff's argument is that "a reasonable juror could conclude that because Plaintiff was neutralized, . . . he could not go anywhere, [and] had his hands raised up demonstrating he was giving himself up, that Defendants Klenner, Przybylo, and Boczkaja used excessive force both when Przybylo tased Plaintiff when Boczkaja deployed OC spray at Plaintiff, and when Defendants Klenner and Przybylo punched Plaintiff multiple times while he was in the grasp of at least four officers and not resisting." (*See* ECF No. 33, PageID.807.)

While a suspect's refusal to comply with "officers' repeated demands for him to get out of the car" can be a part of conduct deemed to be active resistance, Plaintiff is correct that "noncompliance alone does not indicate active resistance; there must be something more." *Eldridge v. City of Warren*, 533 F. App'x 529, 533, 535 (6th Cir. 2013). But viewing the dashcam footage, which puts Defendant Officers' conduct in the context of the totality of circumstances and the risks they faced, the court finds that no genuine factual dispute exists that calls into question the reasonableness of the Officers' decisions to use various methods of force to prevent Plaintiff from attempting to operate the car and to quickly remove him from the vehicle.

The reasonableness of the Officers' use of force to extract Plaintiff from the car is demonstrated by reviewing precedents from this Circuit involving similar fact patterns.

An overview of the case law was recently provided in *Browning v. Edmonson Cnty.,*
*Kentucky*, 18 F.4th 516 (6th Cir. 2021). In *Browning,* the court denied a request for
qualified immunity after the defendant officers tased an unconscious minor who had
been a backseat passenger in a vehicle involved in a highspeed chase because he did
not exit the vehicle as commanded. *Id.* at 528-29. In reaching its decision, however, the
court reviewed and distinguished relevant case law in two ways. First, the court noted
that use of force, including the use of a taser, is not constitutionally suspect when an
individual is conscious and actively resisting officers, "either by being verbally hostile
towards the officers or by taking some sort of voluntary physical action in addition to
their noncompliance." *Id.* at 527-28. Second, reviewing cases involving high-speed
chases, the court reached the common-sense conclusion that greater use of force is
justified following a chase where a "driver [] had already engaged in highly dangerous
evasive driving" but not in the case before it where the plaintiff "was a passenger in the
backseat whose worst apparent criminal activity was not wearing a seatbelt." *Id.* at 528
(citing *Tallman v. Elizabethtown Police Department*, 167 F. App'x 459, 461 (6th Cir.
2006); *Dunn v. Matatall*, 549 F.3d 348, 350 (6th Cir. 2008); *Williams v. Ingham*, 373 F.
App'x 542, 547-48 (6th Cir. 2010)).

   The court finds the present factual scenario is most analogous to two Sixth
Circuit decisions involving both a taser deployment and forcible removal of a suspect
from a vehicle. In *Williams* for instance, the court found qualified immunity applied when
a suspect was tased following "a high-speed chase through a residential area," after the
suspect ignored "verbal commands to show his hands and exit the vehicle" and
"continued to struggle to hold his hands under his body" after being dragged from his

car. *Williams*, 373 F. App'x at 548. Likewise, in *Foos v. City of Delaware*, the court found officers' use of force, including *repeated* deployment of a taser, to "extract" a driver who continued to rev the engine and spin the tires of his F-150 pickup truck after crashing it into a concrete pillar "was not objectively unreasonable." 492 F. App'x at 584.

The fact that Plaintiff stopped trying to accelerate his car and put his hands in the air for a mere three seconds as Officers began surrounding his running vehicle is simply not a sufficient change in conduct to demonstrate a lack of risk. (*See* Def. Ex. I at 9:10-9:15.) After all, the video shows that Plaintiff quickly reached down and returned a hand to the steering wheel. (*See id.*) Given Plaintiff's use of his car only seconds earlier and his prior disregard for the safety of others, Plaintiff's decision to disobey shouted commands and instead return his hand to the steering wheel (regardless of his actual intent) would be viewed objectively by a reasonable policeman as a continued threat to officer safety. "What's more, the short time frame involved here cuts in favor of a finding of reasonableness, as the officers were forced to make split-second decisions on how much force to use in a quickly developing, volatile situation." *Hightower v. City of Columbus*, No. 2:12-437, 2013 WL 5963215, at *13 (S.D. Ohio Nov. 7, 2013).

Nor was Defendant Klenner's use of physical strikes unreasonable. A taser and pepper spray had already proved ineffective at getting Plaintiff to release his grip. Plaintiff's own testimony indicates he continued to resist being pulled from the vehicle. (ECF No. 29-3, PageID.250 ("I just closed my eyes and just gripped the steering wheel a little bit tighter but didn't move my hands.").) Once Officers began extracting Plaintiff from the vehicle, Plaintiff's decision to attempt to hold onto the interior of the car clearly constituted active resistance. As the Sixth Circuit summarized in *Foos*, "'[t]here are only

16

so many ways that a person can be extracted from a vehicle against [his] will, and none

of them is pretty. Fists, batons, choke holds, dogs, tear gas, and chemical spray all

carry their own risks to suspects and officers alike.'" *See* 492 F. App'x 582, 584 (6th Cir.

2012) (quoting *Mattos v. Agarano*, 661 F.3d 433, 459 (9th Cir.2011) (en banc)).

### 2.    Plaintiff's handcuffing and arrest

The next relevant segment for the excessive force analysis is the time period

between when Defendant was pried from his car and when he was handcuffed and

returned to his feet. During this period, Officers removed a gun from Plaintiff's hip as he

resisted Officer's attempts to carry him along the side of his car, and Officers struggled

to grab Plaintiff's hands from underneath him on the ground so he could be handcuffed.

The dashcam footage shows that Officers Klenner and Przybylo collectively delivered a

few additional strikes to Plaintiff during this period. But it also demonstrates that Plaintiff

continued to resist Officers once he was removed from the car. For instance, Plaintiff

can be seen contracting his torso and attempting to move his legs as Officers attempt to

carry him through the small gap between the driver's side of his car and the residential

garage door. (*See* Def. Ex. A at 7:50-8:05.) Further, once face down on the ground,

Plaintiff kept his hands underneath him, despite Officers' repeated commands, and he

physically resisted Officers' attempts at grabbing his hands. (*See* Def. Ex. L at 8:05-

8:30.)

The Supreme Court has indicated that "[n]ot every push or shove, even if it may

later seem unnecessary in the peace of a judge's chambers violates the Fourth

Amendment." *Graham*, 490 U.S. at 396. Courts in this Circuit have repeatedly found

that limited physical strikes, including close-fisted punches, are not objectively

unreasonable under *Graham* when used to gain control of a suspect, even when the impetus for the arrest was a crime comparatively minor to the one at issue here. *See*, *e.g.*, *Brax v. City of Grand Rapids*, 742 F. App'x 952, 957 (6th Cir. 2008) (holding that defendant officer's "split-second judgment that a single punch was necessary to subdue a drunk, strong, and resisting young [suspect]" did not violate the Fourth Amendment); *Schliewe v. Toro*, 138 F. App'x 715, 722 (6th Cir. 2005) (finding that a blow that broke a plaintiff's jaw was not objectively unreasonable, where the "apparently intoxicated," plaintiff who "was not charged with a serious crime . . . attempt[ed] an escape from the holding area of the police station"); *Bland v. Wagner*, No. 1:19-CV-297, 2021 WL 311375, at *6 (W.D. Mich. Jan. 4, 2021), *report and recommendation adopted*, ("[I]n the instant case, it cannot be said that Defendants' use of force on Plaintiff, including Defendant Wagner's punches to Plaintiff's face resulting in Plaintiff's loss of teeth, was objectively unreasonable where Plaintiff fought Defendants' attempts to handcuff him and made it clear to the officers that they would have to use force to control him.").

While Plaintiff also complains he received a gash above his eye from being dropped on the ground, the video clearly shows that Officers attempted to place Plaintiff on the ground in a controlled manner. (*See* Def. Ex. L at 7:30-8:05.) The video further demonstrates that Plaintiff was not kicked while he was on the ground and that he quickly returned to his feet after being handcuffed. (*See id.*) In sum, considering the totality of the circumstances, undisputed evidence establishes that Defendant Officers'

18

relatively limited use of physical force against Plaintiff was objectively reasonable because Plaintiff was actively resisting arrest.[4]

### B. Failure to Intervene

Defendants also contend that they are entitled to summary judgment on Plaintiff's claims for failure to intervene asserted against all seven Defendant Officers. To establish liability for failure to intervene in another officer's excessive use of force, the plaintiff must demonstrate that "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Mere presence during an altercation is insufficient to establish liability—the plaintiff must make some showing of "direct responsibility." *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013). Applying this test, the court finds that Plaintiff has failed to establish a viable claim against any of Defendant Officers that can survive summary judgment for two independent reasons.

First, the court has already found that no Officer violated Plaintiff's constitutional rights by using excessive force. Plaintiff cannot pursue a failure to intervene claim in the absence of an underlying constitutional violation. *See, e.g.*, *Craft v. Billingslea*, 459 F. Supp. 3d 890, 912 (E.D. Mich. 2020) (Drain, J.) ("[A]s there was no constitutional

---

[4]      Further the court notes that while Plaintiffs' complaint alleges that all seven Defendant Offices engaged in excessive force, his summary judgment brief only cities conduct by Officers Klenner, Boczkaja, Kelly and Przybylo. Because "each Defendant's liability must be assessed individually based on his or her own actions," *see Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015), the fact that Plaintiff has pointed to no allegedly unconstitutional use of force by the three other Officers indicates that Plaintiff has implicitly conceded there being no basis to assert an excessive force claim against them.

violation, the other officers present cannot be held on a failure to intervene claim."). Second, the court finds that Plaintiff has failed to show that any of Defendant Officers had "a realistic opportunity to intervene and prevent harm." *Ontha v. Rutherford Cty., Tenn.*, 222 F. App'x. 498, 507 (6th Cir. 2007). It is undisputed that Officer Boczkaja's use of pepper spray, Officer Przybylo's deployment of his taser, and Officer Kenner's three initial strikes all were separate acts that lasted less than ten seconds. The Sixth Circuit has held that "an excessive use of force lasting ten seconds or less does not give a defendant enough time to perceive the incident and intervene to stop such force." *Pineda v. Hamilton Cty., Ohio*, 977 F.3d 483, 493 (6th Cir. 2020) (quoting *Alexander v. Carter for Byrd*, 733 F. App'x 256, 265 (6th Cir. 2018)) (internal quotation marks omitted). So, the court finds that the "fleeting" nature of alleged unconstitutional conduct deprived other Defendant Officers of "the opportunity to intervene and prevent any harm." *See Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013).

### IV. CONCLUSION

As shown through undisputed video exhibits, Defendants did not use excessive force in violation of Plaintiff's constitutional rights when they pulled Plaintiff from his car after a high-speed chase and arrested him. Furthermore, the court finds that no reasonable jury could conclude that Defendants had a duty to intervene at the time of the arrest. Therefore, the court will grant Defendants' summary judgment on all counts brought under federal law.[5] Accordingly,

---

[5]     While Plaintiff's complaint sued Officers in both their official and individual capacities, Plaintiff appears to have already conceded that an official capacity claim for damages here would be barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). (*See* ECF No. 34, PageID.1026.)

IT IS ORDERED that Defendants' Joint Motion for Summary Judgment (ECF No. 29) is GRANTED.


s/Robert H. Cleland                          /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 29, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 29, 2022, by electronic and/or ordinary mail.

s/Lisa Wagner                                /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C1 ORDERS\20-10442.CARTER.MSJ.AAB.EKL.docx